MAROOSIS v. SMYTH, Collector of Internal Revenue.

No. 12530.

United States Court of Appeals Ninth Circuit.

Feb. 9, 1951.

Rehearing Denied March 14, 1951.

Morris M. Grupp, Leon Schiller, San Francisco, Cal., for appellant.

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott, Benjamin H. Pester and Ellis N. Slack, Sp. Assts. to the Atty. Gen., Frank J. Hennessy, U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, HEALY, and BONE, Circuit Judges.

STEPHENS, Circuit Judge.

On May 1, 1944, in conformity with Title 26 U.S.C.A. § 2800(k),[1] which imposes floor stock taxes on distilled spirits, the taxpayer herein, Nick W. Maroosis, filed his return and paid the taxes in accordance therewith to James G. Smyth, United States Collector of Internal Revenue for the district. The return reported 1330.36 proof gallons of distilled spirits on hand on April

[1]. T.D. 5337, CB 1944 p. 674 contains the regulations prescribed pursuant to the Floor Stocks Tax Law. We quote applicable portions therefrom:

"Sec. 171.116. Inventory of Distilled Spirits Required.—Each distiller, fruit distiller, proprietor of an industrial alcohol plant, internal revenue bonded warehouse, alcohol bonded warehouse, tax-paid bottling house, and each rectifier, wholesale dealer in liquors, retail dealer in liquors, manufacturer, or any other person, corporation, partnership, or association holding on April 1, 1944, tax-paid distilled spirits, including alcohol, intended for sale or for use in the manufacture or production of any article intended for sale shall, before beginning business on April 1, 1944, prepare an inventory of such tax-paid distilled spirits.

"Sec. 171.117. Preparation of Inventory of Distilled Spirits.—(a) Division into three sections.—The inventory of distilled spirits will consist of three sections as follows:

"Section 1. Distilled spirits on the premises of the taxpayer.

"Section 2. Distilled spirits owned by the taxpayer and stored elsewhere.

"Section 3. Distilled spirits owned by and in transit to or from the taxpayer.

" * * *.

"(b) Spirits stored elsewhere or in transit.—Section 2, covering spirits owned by the taxpayer and stored elsewhere on April 1, 1944, and section 3, covering spirits in transit to or from the

1, 1944, the tax date. The Collector found an underdeclaration of floor stocks and fraud in the return, readjusted the tax due upward and assessed a penalty. The taxpayer paid in accordance with the Collector's findings and brought suit in district court for refund. The district court found in accordance with the Collector's determination, and taxpayer appealed.

Disbelieving the amount of floor stocks reported by the taxpayer the Collector caused his agents to take a physical inventory of the stocks in appellant's store as of May 2, 1944, and the result was adjusted back to April 1, 1944. On comparison with taxpayer's inventory it was revealed that the taxpayer's inventory, if it could be relied upon, had overdeclared the floor stocks in the amount of 198.98 proof gallons.

The Collector was not satisfied that either the inventory reported by his agents or the report by the taxpayer accurately reflected the amount of distilled spirits held for sale by the taxpayer on the tax date. Consequently, he determined from a previous floor stocks tax return taxpayer's opening inventory on November 1, 1942. From the records of wholesale liquor dealers, he ascertained the amount of distilled spirits purchased by taxpayer from November 1, 1942 to March 31, 1944. During the same period, taxpayer's gross sales amounted to $276,328.51. By computing the percentage of gross sales which represented distilled spirits, the dollar amount of distilled spirits sold was determined, and this result was divided by the agreed average selling price per proof gallon which yielded the figure 11,023.46, allegedly representing the number of proof gallons of distilled spirits sold. Deducting this 11,023.46 from the amount representing inventory plus purchases from November 1, 1942 to March 31, 1944 indicated that 2,553.21 proof gallons of distilled spirits was the gallonage on hand as of April 1, 1944.

The method of computation outlined showed an underdeclaration by taxpayer of 1222.85 proof gallons on his tax return.

The Collector's agents asked the taxpayer what percentage of total sales the sales of distilled spirits constituted, and the reply was 66%. Later, however, he stated that 86% was the proper figure. The Collector accepted the latter figure and used it in determining the floor stocks tax due.

The underdeclaration of 1222.85 proof gallons was used as the basis for the additional assessment by the Collector. A penalty of 50% was added to the total amount of floor stocks taxes incurred, as provided for in Title 26 U.S.C.A. § 3612(d) (2).

On May 25, 1944, the State Board of Equalization for the State of California conducted an audit of the sales of distilled spirits of the Geary street store. This audit, based on the taxpayer's books of account, disclosed that the percentage of gross sales which constituted sales of distilled spirits was 96.41%. A copy of the audit was mailed to the Collector, and the additional assessment, plus the penalty, together with interest, was paid under protest.

Taxpayer was the proprietor of three retail liquor stores in San Francisco situated on Geary, Haight, and Fillmore Streets, respectively. One Hedrick, employee of the Alcohol Tax Unit of the Bureau of Internal Revenue, testified that he first became acquainted with taxpayer in December, 1943, when he visited the store while performing his duties of investigating black market activities in liquor. From records submitted to the Alcohol Tax Unit by wholesalers, information of taxpayer's eastern purchase of liquor in considerable quantities for shipment to the Pacific Coast was obtained.

In March, 1944, Hedrick ascertained that taxpayer had purchased 775 cases of whiskey which had been stored in a San Fran-

taxpayer on April 1, 1944, will contain the same columns as section 1, except that any column not applicable may be omitted. The address of each place of storage for spirits recorded in section 2 should be shown, as well as the serial numbers of all full cases. The means of transportation, name and address of the consignor or consignee, and serial numbers of all full cases should be shown in section 3."

cisco warehouse. On the morning of March 31, 1944, the date the taxpayer's inventory was taken, he and one Arisco, another employee of the Alcohol Tax Unit, while driving past the Geary Street store, observed a large canvas-covered truck parked at the front. About an hour later the truck was driven to the San Francisco warehouse where taxpayer's whiskey was stored. A coupe, known by Hedrick to be associated with taxpayer's store, came to the warehouse, and the driver of the truck and the driver of the coupe had a conference while the cartons were being loaded on the truck. The truck and coupe left the warehouse and drove into a garage near the waterfront. There, Hedrick and Arisco observed the transfer of the cartons from the large truck to a small black panel-bodied truck that was also parked in the garage. The panel truck left the garage and Hedrick followed it to the basement garage of a residence on San Bruno Avenue.

Hedrick then rejoined Arisco near the garage where the large truck was located. This truck proceeded to the Geary Street store where cartons were taken from the truck and loaded into automobiles parked at the curb. The truck then proceeded to the Fillmore Street store where the driver removed four hand-truck loads of cartons from the store and placed them on the truck. The truck was thereafter lost in traffic. Although Hedrick and Arisco continued to observe taxpayer's three liquor stores, none of the cartons appears to have been taken into any of the stores. The records of the truck rental agency revealed that the truck had been returned shortly after Hedrick and Arisco had lost sight of it.

Although taxpayer testified on his own behalf, he made no attempt to explain these occurrences, but his counsel elaborated upon his client's accounting system as based upon a daily perpetual inventory. Neither taxpayer nor his accountant gave any reason for the full itemization of the small sales in the daily sales book, while large sales were without mention except in the ledger. Taxpayer was asked to account for the fact that while for the five months prior to December of 1943, total monthly sales never exceeded $15,003.00, yet in December they amounted to $62,946.84. Taxpayer stated that he had no records to show the subject of these and other large sales, or as to the sale price of any particular item of whiskey sold.

The trial court concluded that the taxpayer had knowingly and intentionally omitted to report large amounts of distilled spirits on hand, and that the inventory reported was fraudulently false, and that the Collector was justified in determining that the best possible method of calculating taxpayer's floor stocks was to take 86%, as mentioned by the taxpayer, as the proper portion to allocate to distilled spirits.

The court held that the Collector was not obliged to accept the State Board's audit of taxpayer's books, and found that the large sales recorded in the ledger together with the taxpayer's explanation instead of indicating disposal of a large stock rather supported the inference that some of the sales were above ceiling prices. Consequently, on the basis of the large amount of dollar sales, there would be extra merchandise on hand which the taxpayer might be expected to make an effort to conceal. A judgment of dismissal was therefore ordered and was subsequently entered.

The main point relied upon by taxpayer on appeal is that the assessment was arbitrary and excessive, since the Collector could not use the 86% estimate given by the taxpayer as the percentage of distilled spirits sales against gross sales when his books reveal that 96.41% is the proper figure according to the State Board of Equalization audit.

The books of a taxpayer are not conclusive either for or against the Collector under all circumstances. Bergdoll v. Pollock, 1877, 95 U.S. 337, 24 L.Ed. 512. If taxpayer's books contain insufficient or improper entries, taxpayer must suffer the consequences. Bergdoll v. Pollock, supra; Burnet v. Houston, 1931, 283 U.S. 223, 228, 51 S.Ct. 413, 75 L.Ed. 991. The burden was on the taxpayer to establish his right to

recover.[2] See Helvering v. Taylor, 1935, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623; United States v. Mitchell, 1926, 271 U.S. 9, 46 S.Ct. 418, 70 L.Ed. 799; United States v. Anderson, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347. He must show that he did not owe the money which he paid and which he seeks to recover. Duffin v. Lucas, 6 Cir., 1932, 55 F.2d 786. A judgment for overpayments cannot be predicated upon a basis of inferences. Philip Mangone Co., Inc. v. United States, 1931, 54 F.2d 168, 73 Ct.Cl. 239. Taxpayer was bound to produce the best available evidence to explain the occurrences viewed by the Collector's agents and the omissions and inconsistencies in his books. Burnet v. Houston, supra.

■ Where the taxpayer rests his claim for a refund upon the information contained in his books, if the trial court's finding that his books are wilfully inaccurate or incomplete is supported by the evidence, then he has failed to carry the burden placed upon him to demonstrate that the assessment was wrong. See United States v. Anderson,

supra. If the records fail to reflect the proper inventory, a computation may be made in accordance with a method reasonably calculated to reflect the true figure, based on inferences properly drawn from the facts. See Bishoff v. Commissioner, 3 Cir., 1928, 27 F.2d 91; Hague Estate v. Commissioner, 2 Cir., 1943, 132 F.2d 775. In such cases the Collector can properly look elsewhere for evidence, Kenney v. Commissioner, 5 Cir., 1940, 111 F.2d 374, and may rely upon an admission by the taxpayer himself.

Taxpayer also contends here that the fraud penalty cannot be upheld because the Collector failed to prove fraud by clear and convincing evidence.

■ The statute provides that in case a false or fraudulent return or list is wilfully made, a 50% penalty shall be added to the tax.[3] Fraud is not to be presumed but must be determined from clear and convincing evidence, considering all the facts and circumstances involved. Jemison v. Commissioner, 5 Cir., 1930, 45 F.2d 4. The burden of proving fraud is on the Collector. Grif-

2. Different rules prevail where the court is asked to review a redetermination of taxes assessed, but unpaid. Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; See J. M. Perry & Co. v. Commissioner, 9 Cir., 1941, 120 F.2d 123; Hemphill Schools Inc. v. Commissioner, 9 Cir., 1943, 137 F.2d 961; San Joaquin Brick Co. v. Commissioner, 9 Cir., 1942, 130 F.2d 220.

3. Title 26, U.S.C.A. § 3612: Returns Executed by Commissioner or Collector.
"(a) Authority of collector. If any person fails to make and file a return or list at the time prescribed by law or by regulation made under authority of law, or makes, willfully or otherwise, a false or fraudulent return or list, the collector or deputy collector shall make the return or list from his own knowledge and from such information as he can obtain through testimony or otherwise.
"(b) Authority of Commissioner. In any such case the Commissioner may, from his own knowledge and from such information as he can obtain through testimony or otherwise—
"(1) To make return. Make a return, or
"(2) To amend collector's return.

Amend any return made by a collector or deputy collector.
"(c) Legal status of returns. Any return or list so made and subscribed by the Commissioner, or by a collector or deputy collector and approved by the Commissioner, shall be prima facie good and sufficient for all legal purposes.
"(d) Additions to tax.
"(1) Failure to file return. * * *.
"(2) Fraud. In case a false or fraudulent return or list is willfully made, the Commissioner shall add to the tax 50 per centum of its amount.
"(3) Cross reference * * *.
"(e) Collection of additions to tax. The amount added to any tax under paragraphs (1) and (2) of subsection (d) shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, falsity, or fraud, in which case the amount so added shall be collected in the same manner as the tax.
"(f) Determination and assessment. The Commissioner shall determine and assess all taxes, other than stamp taxes, as to which returns or lists are so made under the provisions of this section."

fiths v. Commissioner, 7 Cir., 1931, 50 F.2d 782; Budd v. Commissioner, 3 Cir., 1930, 43 F.2d 509.

█ The intentional and deliberate omission of material facts from a report required by law constitutes fraud within the meaning of the internal revenue laws. United States v. Fidelity & Casualty Co. of New York, 3 Cir., 1940, 115 F.2d 475. We hold that the district court's determination that the tax return was false and that taxpayer knowingly concealed and failed to declare the full measure of his floor stock was correct. See regulations in footnote number (1).

It is contended that the evidence does not support the Findings of Fact and Conclusions of Law as to all essential issues, but it is apparent from the above recitation of facts that such claim cannot be upheld in any particular.

The judgment dismissing the complaint is affirmed.

Affirmed.